Whenever you are ready, Mr. Odom will hear from you. Good morning. May it please the court, counsel? I'm Preston Odom of the law firm of James McElroy & Diehl in Charlotte, North Carolina. And I'm here this morning representing the respondent, appellant in this case, Lisa Michelle Bailey. I appreciate this opportunity to come before your honors. This is like you, Judge Richardson, being the first time on a three-judge panel. This is my first argument to the Fourth Circuit with a three-judge panel. I appreciate the opportunity. This case deals with whether Ms. Bailey, my client, wrongfully retained the party's child in Asheville, North Carolina, where she moved with the father's permission. She left with the party's child, who was three and a half at the time, left in September of 2016 bound for Asheville to start a new life together with the party's child. Left circumstances where the parties had divorced the previous August of 2015. Throughout their marriage, they had discussed the possibility of... And when she left with the child, their agreement was that it would be for several months. Yes, Your Honor. It used that indefinite term, several months. And there's evidence... So that's not a... Is several months a permanent change? Is that some evidence of intent that they're going to stay in America? Your Honor, I believe that it's evidence of an intent that it be a stay of indefinite duration. There is testimony in the record that they left it open-ended that way because they weren't sure if it was going to work out for Ms. Bailey and the child to be making a new life for themselves in the United States. Ms. Bailey, before they had moved, and with Mr. Sundberg's knowledge,  had rented a room and a house for Ms. Bailey and the child to move to, but she didn't yet have employment. But if it's open-ended, how is that an intent, an indication of intent that she would stay in America with the child? It falls into, I believe, the third category under the Moses test where the parties have left the stay open-ended, but... Is that factually correct? In other words, it seemed to me that the court found that the permission by Mr. Sundberg was to May of 2017, and that's explicitly stated in the email. She said, we need a letter for immigration, and he writes back. He says, you'll get a signed letter that you can stay with LP. That's the child until May 2017. I will visit, et cetera, and so forth. And it seems to me then the letter actually uses that same time period, and the district court found as a fact that that was the agreement of the parties, and your task is to demonstrate that the district court was clearly erroneous in that finding. Yes, Your Honor. And we believe that the record, looking at a totality of the circumstances, shows that there was a clear error. When you review the entire record, you're left with a firm and definite conviction that a mistake was made. In February and March of 2017, did Ms. Bailey send an email, said she has decided not to return to Sweden? Your Honor, she sent an email in that time period that rejected Mr. Sundberg's after-the-fact demand that she move back to Sweden. And just stepping back a second, is it reasonable to infer that you are giving permission for a mom and a daughter to move to a different country and to try to establish roots in that country and make things work in that country? And then to have some definite default, you have to move back to the other country at the end of this period. Well, they have joint custody in Sweden. So he has some, yeah, it does make sense for him to say that when there was no final decision that she would move to America. And there's apparently some concern with a cult or something. What can you tell us about that? Your Honor, that arose out of some interactions between the parties when they were living in Bali. And there was an expressed reservation by Mr. Sundberg that if it looked like Ms. Bailey were engaging in a sect cult in Asheville, that she would have to move back. But there is no evidence in the record. So there was some cult in Bali? According to Mr. Sundberg, there was. We don't agree with that. There's also evidence in the record that he wasn't paying child support in Sweden because he was paying off gambling debts and those types of things, which exacerbated the reasons why Ms. Bailey needed to move from Sweden to try to make it in Asheville, North Carolina. Let me ask just a slightly subsidiary question. Yes, Your Honor. The record does show that your client continued to assert her Swedish residency during this entire time frame. Your Honor, it's not so much the Swedish residency as you may be referring to the tenancy agreement where she was letting two rooms. And the record is, I believe you could see it in your brief, the reason for that was so that she maintained Swedish residency so that she and her daughter remained eligible for Swedish government benefits. Right, and she actually expressed reservations for that. Before you get that, the answer to that question is yes, she did that for that reason. Your Honor, she did that such that it was a plan B safety net if things did not work out in the United States, such that it was a plan B if things didn't work out as the parties hoped in the United States. And what happened was things did work out for Ms. Bailey in establishing a stable home environment for the party's child in Asheville. The best case scenario, so it seems to me there are two possible readings of that lease. One, as you suggest, is that it's a plan B, which obviously supports the belief that this wasn't a permanent move, which I suspect you don't like. But the other option is that it's like out-and-out fraud. Right, and so she's defrauding the Swedish government. And so is there a third option? Because neither of those seem very good for your client. One, we have to accept that she committed fraud on the Swedish government in order to believe your position. Alternatively, your position supports, I think fairly strongly, I believe Judge Thacker's position, which is plainly they did not intend this to be a permanent move. Indeed, she did not intend it, much less whether it was a joint intention, because she had an alternative plan. Your Honor, having a backup plan doesn't mean that you don't have an intention to leave the prior habitual residence behind. There's an analogous situation in, I believe it's the Delgado case, where the parties were attempting to leave an unstable Venezuela. And there was an expressed intent to do that, but they hadn't yet determined where the new place of residence was going to be. And I think that situation is analogous to ours in that, at least for this almost nine-month time period, which, remember, there doesn't have to be an intent to permanently abandon the prior habitual residence. It can be for a limited period of time, as this Court recognized in the Humphrey case. And remember, you have to look at the time period immediately before the alleged wrongful retention date. So if the parties intended for the child's habitual residence to be in the United States, Asheville specifically, which Ms. Bailey had scouted out, with Mr. Sundberg's knowledge in early 2016, so during that period of time, if they intended for the child to be habitually, ordinarily residing in Asheville, then there can be no wrongful retention as of the May 31, 2017, alleged return date, because the residence during that time period would have been in Asheville, North Carolina. That actually happened, I believe. Wouldn't that basically mean, though, that a parent in another country could never enter an agreement for a temporary move? Because then the mover would always say, no, no, no. The agreement might say it's temporary. He might say it's temporary, but I believe that it was going to be permanent. I think, Your Honor, if the parent who's in the prior country wants to make it clear, it can be made clear in the party's agreement. I think it's just the opposite. I think that you start out with the presumption that the custody, the marriage, the divorce, and the residence is all in Sweden. And she decides to go to Asheville, and he says, okay, you can go to Asheville until May 2017. That's what he says in his email. And then in the agreement that they actually signed, they say several months, and then in May of 2017 we'll decide, which the clear implication is that the several months ends in May 2017 when we will decide what to do. And that was left in limbo, but the notion is, and then he personally expresses his intent continuously that he never intended a permanent residence, and he protested regularly. Number one, if she gets involved in a cult, the child comes back to Sweden. Which didn't happen. Yeah, and number two, we'll decide, make more permanent decisions about the child in May of 2017. And so I don't quite know how you're addressing the fact that the district judge found these facts sufficient to conclude that Mr. Sundberg's intent was not to change the residency or the habitation. And, of course, we need the intent of both parents under the established principles. And so it seems to me your task, instead of arguing what Ms. Bailey was interested in doing, is to try to address the evidence with respect to where Mr. Sundberg gave up the right to have the child in Sweden. Your Honor, I agree with that. And Mr. Sundberg, as the petitioner, bore the burden of proving by a preponderance of the evidence that the parties lacked the shared intent for Ms. Bailey and the child to move to Asheville, at least for an indefinite period of time. Why are you putting it that way? The child had a habitation in Sweden. The child was registered to go to school there. The child had this tenancy agreement. The child was born there. They had divorced there. They had joint custody there. And she wants to go to the United States. Now, he says, I never agreed to a permanent change. And then the documentary evidence suggests that he didn't agree to a permanent change. Now, what is the evidence that he did? Your Honor, I respectfully disagree with the notion that he did not, through all of the surrounding correspondence, agree with Ms. Bailey that Ms. Bailey would move to Asheville with the party's child and try to make a new life there. And if that happened, he's- What's your best evidence on that, that he agreed? It's the July 25th and 28th email exchange between the parties where he's typing in all capital letters. Yeah, I've got that right in front of me. And he says- That's the one he says, that you can stay with LP until May 2017. Couldn't be clearer. And then read on. And then he says, I'll visit and so forth. And then he says, if you get involved in a cult, comes right back right away. And he also says, if you're happy, we'll talk about a new agreement.  Which all of the evidence is that they were- We'll talk about a new agreement. That indicates this is not an agreement for permanent residency. And it's also not an agreement that you have to come back at the end of May of 2017. There is no requirement in either that email exchange or in the letter itself that there has to be a return to Sweden at the end of May 2017. The question is, where is the intent of Mr. Sundberg to make Asheville the permanent residence of the child? Where is the intent of Mr. Sundberg? And he reserves on that all the time. He says, I'm allowing this trial period to May. We'll decide then. I'll keep my options open. He never says he agrees at that point in time. He says, we'll discuss it. And the question is, is there something in the record that we're overlooking or that the district judge overlooked? Your Honor, I think what the district judge did is import an automatic return date, a default return date at the end of May 2017. And says that in the absence of an agreement, then you have to come back to Sweden where you've put down, despite the fact that you've put down stable roots in Asheville, North Carolina. Leave your job, Ms. Bailey. Take the child out of school and just rip it all up and come back here to Sweden. Well, that's what she did when she went from Sweden to America. With the agreement. She quit her job, took the child, and went to America. She can turn right around and go back. Your Honor, and that's what she had to do because of the return order. But what happened was, on the front end, the parties agreed that there would be a move to Asheville. On the back end, it was a unilateral decision by Mr. Sundberg to pursue the relief in the courts to make Ms. Bailey go back beyond her intent. That was expressed in the original agreement. And I see that I'm over into my rebuttal time. Okay.  We'll have you back up. Thank you, Your Honor. All right. Ms. Hensley. Mr. Hensley. Good morning, Your Honors. And if it pleases the Court, I'm Derek Hensley. I represent Yap Ali, Carl Henrik Sundberg, who has been back in Sweden with his daughter for the last 10 months since Judge Reidinger's return order last December. And we are here to be available to answer any questions you may have about the record. I intended to start out by talking about Moses and how our circuit is one of the five which follow Moses. And this is clearly an example of a second category of the Moses analysis where the child's initial translocation from an established habitual residence was clearly intended to be of a specific delimited period. And the Court should be very slow to find changed intentions, changed habitual residence, without some very clear evidence that both parents intended the move to be permanent. And if we look back at the seminal case of Moses, that was about children who had been on an Exploring America adventure for 15 months already at that point in Beverly Hills to get acclimatized to America. And the Ninth Circuit said, well, you have to look at whether the father really meant for this to become permanent. And I don't think that an interpretation of the Hay Convention that would chill parents' ability and willingness to send their children to study abroad for a year. Academic years tend to be around nine months. That that should slack the parents' right to get the child back to the home country after that exploratory trip. It's the whole purpose of the convention, I think, to give parents some peace of mind when their children go abroad for temporary purposes. I think there was a factual question about the cult. We didn't think it was really appropriate to get into that in depth at the trial level, because it's not a best interest determination whether there was a dangerous cult. But my client did testify that the mother had, in fact, been back in touch, and that there was web correspondence involving the cult members that was concerning him. That undergirded some of his thought processes and, we think, led to some of the breakdown in communications and her lack of willingness to return to Sweden. But the real question, I think you all have hit the nail on the head, is that there was never any shared parental intent. That's a finding of fact determined by the district court, subject to a clearly erroneous standard. I think the Fourth Circuit would do well to make it as clear as possible that the entire habitual residence inquiry is one primarily of fact. In the supplemental authorities cited by opposing counsel on Friday, he pointed out that just about one week ago, the Sixth Circuit came out with a majority en banc decision that says the entire habitual residence determination is one of fact. And I think that's a very realistic appraisal of such a fact-intensive situation as a child's attachment, family ties, their sense of belonging, and the parents' intention, which we've long held, looking back to Gitter, which quoted Well, it's one of those things that the law, it's like employment as an employee. The underlying facts are reviewed for clear error. And the question then is whether it amounts to a new location, amounts to sufficient intent, or amounts to habitation, might be a question of law. It's a little bit like the notion of negligence. The facts are one thing, and whether those facts amount to a claim is another thing. And so I think we can handle that on a case-by-case approach. Yes, Your Honor. And there was just a lot of talk about that in the rebuttal brief of the appellant. And so I just wanted to stake our position out there because they had mentioned But I think Mr. Odom agrees that the question of intent, the facts that the court relied on, are reviewed for clear error. Now whether those facts, as established by the court, amount to the legal requirements, that's another issue, which are probably a question of law. But I was trying to question him about the evidence on which the court relied, the facts on which the court relied, and I thought that was the nature of our discussion. Yes, Your Honor. And certainly I think we prevail based on the fact that there was no clear error in the district court's determination. I was just going to suggest that there was some ambiguity noted by the secondary source author of the Federal Judicial Guide to Hague Abduction Cases saying that we were an outlier in having a clear error review of the ultimate finding of habitual residence. I actually think that that view of it actually runs through Maxwell and back to Moses. It's not stated explicitly in the standard of review sections of those opinions, but during the discussion they say each of the subordinate conclusions about parental intent and acclimatization are specifically fact findings and in the Maxwell decision it also says that the trial court did not clearly make a clear error in its factual determination of habitual residence. It's not stated that way in the standard of review section, but in the discussion it is, and then the unpublished decision Reyes v. Jeffcoat just made that a little bit more clear and distinct. So I think the Fourth Circuit would do well to just clarify that there's no real way to distinguish the fact findings of both of those prongs from making the whole habitual residence a finding of fact. But I think that's an academic discussion that we don't, as a party, have much of an interest in because I think we come out on top either view. But I thought it was interesting and worth discussing. Since you sort of talk about the standard of review, walk me back a little bit to the standard. You know, your colleague puts a lot of weight on the idea that your party bore the burden of proving a habitual residence. Help me understand, because if you look at the statute, the 9003 subsection E, it does, and I'll tell it to you, you don't have to actually look at it, it says that the petitioner bears the burden to establish the wrongful removal. But then we take the next step, and so in the scenario we then look at is the habitual residence question. And what I want to know is, do you believe that your client met the burden by establishing the previous residence in Sweden such that it shifts over to your opponent to rebut that through this sort of change? Or do you believe that you continue to bear that burden of persuasion at each stage of that analysis? I don't find any case law support that comes to mind for the proposal that you divide up the habitual residence analysis. And I believe we had the burden of showing that habitual residence at the time of the wrongful retention was in fact a violation of his rights and that he opposed it, and that the child was habitually resident in Sweden. I think where it sort of gets fuzzy is that the evidence of habitual residence in Sweden as time went on was clear, and we had a lot of evidence about that. He was no longer in the same place with the child as of the time of the wrongful retention, so we proved all the facts to meet our burden, but the court does of course look and say, do these facts constitute a change in habitual residence from Sweden during this time frame that we're talking about? I do understand the sort of lack of point by point. Maybe to ask it a slightly different way is in a hypothetical scenario where the question of a shared intent, and I don't believe it's this case except that, but if we had true equipoise on the issue of shared intent, for example, shared intent to transfer, we could not tell whether it was or wasn't a sort of really, at that equipoise, you would say that you lose because you have the burden to establish the negative, that is, there was no shared intent. Yes, Your Honor, I believe that's accurate that we have the burden of proof, 51%, that the child's habitual residence had not changed through parental intent and acclimatization all happening, because of course without parental intent, acclimatization is slow to happen. If parental intent is a more difficult question and there's enough acclimatization, eventually it can push it over, but yes, we believe we did set forth the facts, more than 51%, that the child had not lost Sweden as the habitual residence by the time of the wrongful removal. If Your Honors have, oh, I'm sorry. All right, is that it? Yes, Your Honor, thank you so much. Thank you, Your Honor. Just a couple points. On the standard of review, we do believe that the overarching habitual residence determination of a district court is reviewable in anovo, because you have to apply the legal precepts to the facts as they are. Until October 17th, this was the only circuit that was using clear error review of that overarching determination by way of the unpublished Reyes v. Jeffco case. The Sixth Circuit, ten of the judges of the 18-judge en banc panel believed that clear error review applies to habitual residence, the overarching determination. The other eight disagreed. So now there's two circuits potentially out of the 11 that apply clear error review to the habitual residence determination. And just a side note to that, in this court's decision in Alcala, this court applied de novo review to the determination of whether a child was now settled under the Hague Convention. And it didn't apply clear error review to that determination, nor did the court in Padilla apply a clear error review to the consent defense, which is actually at issue in this case. The panel there reviewed it de novo. And so we think that if those precepts under the Hague Convention are reviewed de novo, then so too should the habitual residence determination. I do agree that at least the shared parental intent aspect of the habitual residence inquiry, case law says that that is reviewed for clear error. And again, we believe that when you look at the correspondence and dialogue between the parties before they entered into the relocation agreement in August of 2016, and then follow-up correspondence where it's almost, if you look at the emails exchanged and the WhatsApp texts between the two parties, it clearly shows that Mr. Sundberg believed that there was going to be an indefinite stay in Asheville and was regretting that decision because after coming and visiting the parties... You realize when you make an argument like that, you're basically saying the court was wrong when the court said it was a limited stay. In other words, it looks to me, if you want us to look at the facts in which the court relied, it looked like there was an agreement to move for a limited period after which the parties would discuss the issue. That's where the court came out. And that discussion was to take place in May of 2017. And it seems to me that both the email and the agreement give a fair amount of support to that. Your Honor, what I think the district court did here was say that in May of 2017 language of the letter the party signed was a, you have to return to Sweden then. It wasn't a... It doesn't make any difference. You want to cabin it all, but let's just take the evidence the way it is. It says, I'll visit to see you and LP, see if you're happy. So we can talk about the new agreement. If you're involved with an unhealthy sect, you come back as soon as possible. But the letter says you can stay with LP until May of 2017. And then the agreement says you can go across there for several months and then in 2017 we'll determine the future. Now that's saying the same thing. The idea is for a period of months you can take LP to the United States and then in May I'm going to come over during the winter and in May we'll talk about it and see what happens. But that's hardly an agreement consent to a permanent change and a new future. Rather it's a temporary change to try to figure out what the future will be on a permanent basis. And of course during that stay Ms. Bailey says that she's not going to bring the child back to Sweden and he gets very angry, as you know, and we have this lawsuit. Yes, Your Honor. And again, just to wrap up, I'm almost out of time. We believe that there was either an intent for there to be a change of habitual residence for at least the September 2016 to May 2017 such that there couldn't have been a wrongful retention as of the end of May 2017 or it was an indefinite stay under the third category of cases under the Moses test. Thank you. I'll go back to the first one. Your argument is that there was a relocation, a change of the habitual residence for the period up to May? Yes, Your Honor. Consistent with the Blackledge case, the Humphrey case, and some other cases that say that you can have a change of habitual residence for a limited period. In the Blackledge case it was for a year. Wouldn't you need the agreement of the husband? Yeah, and we believe there was the agreement of the husband. Thank you, Your Honor. All right, thank you, Mr. Odom. We'll come down to Greek Council and take a short recess.
judges: Paul V. Niemeyer, Stephanie D. Thacker, Julius N. Richardson